Delshah 60 Ninth, LLC v. Free People of PA Mark Tetici, Appellant, Free People I'd like to ask you something right out of the box. Yes, Your Honor. You have argued to us that the Court erred by concluding that the shutdown order did not amount to a taking. But you have not argued to us that the Court erred in making this decision as a matter of summary judgment without regard to whether the contract was ambiguous as to whether these facts constituted a taking. Am I correct on that? I don't see any evidence of that argument being made. We haven't argued that there is an ambiguity in the contract. I think that there is. And we, I think, argued this both below and in our briefing. I think there are questions about the operation of business, I guess. So it's not a question for us as to whether the Court was right in granting summary judgment. If we felt that, if we believed that the contract was ambiguous and on its question and summary judgment should not have been granted, it should have been left for trial, that would not be an issue that would enter into our judgment because you haven't advanced the argument. You have only argued that the Court was wrong. It should have granted summary judgment the other way. It should have found that this was a taking. And that's the only, that's the only issue we have to consider. Well, Your Honor, I think that it's, I do think we've pressed both points. I think it's most clearly in our reply brief saying that if the Court concludes that there is a dispute of material fact, and in their response, with their second step brief, Delsha does dispute the nature of what our business is, then I think the appropriate course of action is to remand for there to be fact-finding, for there to be a trial here. It's, we believe that there is sufficient evidence in the record, we've believed that all along, and that there shouldn't be any, there aren't any material disputes of fact in that point. But yes, Your Honor, if you ultimately don't agree with us on the undisputed nature of that, I think the course of action, I think it's clear that sending it back down for trial and what our business is, is appropriate. But it's not something that, it's not a, it's not relief that you requested in your principle brief. Okay. Go ahead with your argument. Thank you, Your Honor. Well, on the same point, I also have this kind of question. I guess I want to press it a little further. The neither party offered or the record does not contain any extrinsic evidence of what the parties meant by such terms as its business. Is that right? Well, there is evidence in the record on that, Your Honor, and I can give you some of it if you like. There is a certification from our head of real estate. It's called the Yagle certification. It's at pages 1318 and 1319 in the appendix where Mr. Yagle says that the purpose of entering into this lease was the operation of a retail store. He discusses the retail brand purpose for free people of creating an emotional connection between shoppers and the brand in the store and how important retail, in-person retail shopping is to that. Now, you guys thought it meant, but is there any evidence that that was discussed or that somehow both parties understood that? Yes, Your Honor. There's evidence on that, too. Mr. Shaw, the principal for Delshaw on the other side, testified in his deposition that he understood from, quote, the inception of the negotiations that the purpose of the lease was to operate what he called, quote, a commercial store. So there is evidence in the record that both parties from the beginning believed that this was the purpose here. There's other evidence from when the shutdown first began. It's 1155, 1156 in the appendix. There are e-mails back and forth where we say we're not able to operate our business, using, again, that phrase from the lease, operate our business. And the parties are back and forth discussing whether there should be an abatement of rent or a repayment plan entered into. And Mr. Shaw, the principal again for Delshaw, says when retail operations resume, we can, you know, we will be able to sort of work this out. Again, reflecting the contemporaneous understanding of the parties and their course of performance, that the operation of this business, the purpose of this business, what it does is an in-person retail store. That was candidly not something that was disputed until the actual legal dispute began here, and it became efficacious to raise that question as to what our business is and whether it should be defined in the lease. But, yes, Your Honor, to answer your question, that is amply discussed at a number of different points in the record from both parties. And, Your Honor, circling back to the legal point here, the lease defines in the alternative ways to establish a taking. There is the use, occupancy, or enjoyment of the lease premises, and then joined to that phrase by an and-or is operating its business. We've been talking a lot about that already. As we discussed in our brief, Judge Ferman's decision doesn't address that point. It doesn't address the operation of business at all in the decision, and we believe that that is. . . So you're saying we should send it back so he can do that, and he can decide whether or not that's ambiguous or not ambiguous, and then. . . Yes, Your Honor. That's our first-order argument is that it just wasn't addressed. It's just not something. . . There was discussion of that in the magistrate's report and recommendation. We objected to that specific conclusion, how the magistrate judge treated the operate-its-business language. Judge Ferman never addressed that objection in his order adopting the report and recommendation. So, yes, first-order argument there, Your Honor, is that that can happen in the first instance in the district court. Again, we think that there is ample evidence. I was discussing some of it with Judge Lynch that's there that would let you do that and be in the interest of judicial economy, get there in the first instance. But, yes, there's — that's not necessary for you to do that here. You can just send it back. All right. Can you talk about your counterclaims? Yes, Your Honor. So, Your Honor, could I speak briefly just about the notice issue? There was a question whether we were obligated by the lease to submit notice in order to be able to make counterclaims. So, Your Honor, Section 23 of the lease is the provision that has a notice requirement. But contrary to what the district court concluded here, it's not a pre-suit notice requirement. It's a pre-default or pre-termination notice requirement. By the time we asserted those counterclaims in August of 2020, Delsh had already terminated the lease. The lease was terminated effective June 10. The district court concluded that. That is, as far as I know, not disputed in this appeal. And so there was no lease anymore. There would be no purpose to requiring a notice saying, we will hold you in default of the lease you terminated two months ago. Well, it's even worse than that, because it's a notice and cure provision, and it would be very difficult for you to cure their termination of your lease. Yes. So, again, we think that that was — interposes an independent obstacle to our counterclaims and just wanted to address that. But, yes, on the merits of the counterclaims themselves, Your Honor, on the unjust enrichment counterclaim, if you agree with us that this needs to go back down to address that provision in the lease that you operate its business, our view is that that should go back down as well. If we are right about the operation of business, then it was unlawful. Because the basic reason that the district court gave for dismissing the unjust enrichment counterclaim is, well, it wasn't unjust because you owed them the rent for earlier months, so that the sort of bank error in your favor aspect of this, where you made a mistaken payment, really doesn't matter because you owed them money and this was a set-off that they could legitimately make and apply those payments to the prior rent. But if you didn't owe the prior rent, which was the premise of your first objection to the summary judgment for them, if you are correct that that was error, then that undermines the objection to the unjust enrichment claim. Correct. If you kick that leg out from under the stool, then there's — Yes. Though the district court also found that it was duplicative of your contract counterclaim, right? That it failed also because of the notice and cure provision. Because of the notice and cure provision, yes. Right. But that's a separate argument. Separate, right. Exactly. But it's a little different, though, with respect to at least one of your counterclaims, which is the mistaken or the inadvertent payments, right? That's your argument that you made payments that you didn't need to make and you should be able to get those back.  And I think, Your Honor, for the — maybe I'm not sure I understand your question. You're saying the notice and cure applies differently to those? Well, I mean, I thought the district court was suggesting that that was also a problem with that counterclaim, which is different than your contract counterclaim. Yes. And I think it did take that position, Your Honor. We disagree with that both for the reasons I said before and also because the — as an unjust enrichment claim, presuming a world where there is no contract, again, it would be odd to subject us to a contractual notice and cure provision for a common law unjust enrichment claim. Well, it does seem strange that if I accidentally cut two checks for my rent this month, I would have a breach of contract claim if my landlord didn't sort of cancel or send back the second one. Like, that's — the contract has nothing to do with a scenario where you have inadvertent extra payments. Yes, Your Honor. That's right. Okay. All right. Well, you're reserved two minutes for rebuttal. Thank you, Your Honor. So let me figure out how we're splitting this one up, or maybe you'll tell me. Mr. Feder? I'm Mr. Cicinino. Oh, okay. You're going first, Mr. Cicinino. What we propose, Your Honor, is that I'll do six minutes defending the appeal, and then Mr. Feder will do four minutes on the cross-appeal. Okay. That's fine. And my clock is now set at six minutes. Thank you. You bet. It's kind of strange here, after hearing these First Amendment cases, where I'm talking about two words, it's business. I mean, that's really the battlefield as I understand it. And free people, arguing the pandemic prevented from, quote, operating its business, close quote, unilaterally defines its business as, quote, selling its wares to customers who are in the Manhattan's Meatpacking District. But that's a subjective, secret limitation. The R&R held, the purpose of the lease is to Section Q permitted uses. And the Section Q permitted uses, yes, Your Honor? That's a question I had. Why does — why would we say that the permitted uses define its business for this purpose? The permitted uses says they could do anything they wanted in the way of retail there. They could operate a florist shop if they chose, is one of the things that's a permitted use. And you wouldn't be able to kick them out if they changed their business from selling clothes to selling flowers. Is that the same thing as to say that if they don't want to change their business, they never tried to change their business from selling clothes to selling flowers, but something happens external to them that prevents them, or not just external to them, but something that the government orders prevents them from selling clothes, that they have not been disrupted in their business by that, or prevented from doing their business, because they conceivably could change to a different kind of business. Exactly. Your Honor, when we talk about their business, we negotiated those permitted uses. That's all we could have as their business. And it's quite — No, that's all that you could do to prevent them from turning it into a restaurant, let's say, or something else that would be outside of the scope of that. But that doesn't say that their business, for purposes of what happens when their business is disrupted by a government intervention, is doing all those things that they were allowed to do, but they never did. Right? I mean, why would we import their permitted uses that they could do if they chose? Why would we import that into a provision that deals with what happens when the government says, stop doing the thing that you're doing? Your Honor, for the landlord, when it's talking about what is the business of the tenant, it looks to what it negotiated in the lease, which is the permitted uses. Let's set that aside. Let's look on the other side of how the free people presents itself to the world as what is its business. And when you look at its 10-K, it says that it has a global chain of segments described as retail, wholesale, subscription. The 10-K report continues. Our retail segment only channel strategy enhances our customers' brand experience by providing a seamless approach to customer shopping experience. All available company-owned retail segment shopping channels are fully integrated, including stores, websites, mobile applications, catalogs, and customer contact centers. The business was never limited to in-person retail sales. They sell themselves as being this broad sales spectrum. Well, let me just interrupt you a second to go back to this question. The lease agreement uses two different terms. In one provision, it uses the term permitted uses of the space. These are things that the lease allows you to do in this space if you're so disposed. You can do any of these things. There's another term, which is its business, prevented from doing its business. Now, you are arguing that there is an equivalency between those terms, that its business necessarily means everything that the landlord said in the other provision is something you're allowed to do. What is it that requires that the contract be interpreted that way to equate those two terms, which are very different terms on their face? And you're saying we should construe its business as anything that it's permitted to do in that space by the terms of the lease, anything that it's not forbidden to do by the terms of the lease. What is it that requires that those things be interpreted as equivalent, that the one is governed by the other? Two things, Your Honor. First of all, where the tenant asked us to have it within the permitted uses section Q, then that means that they defined it as their business because they asked that it be included as a permitted use within the lease. And second of all, below in the R&R, which was adopted by Judge Furman, the R&R stated that the purpose of the lease was the permitted uses. Those would be my arguments on that. Wait a minute. The R&R, you're saying because the magistrate judge said this, that makes it true? That's kind of an arbitrary argument. My main point was that the tenant asked that these things be within the permitted use, and that because of the question. What be within the permitted use? That these various things be, most importantly, any general retail use, that's the definition of permitted use because that's there. Well, sure. I'm sure the tenant would ask for it. It's to the tenant's interest to have the least possible restrictions on what it can use the space for. Agreed. The tenant wants to be able to do anything it wants to do. It doesn't want to run the risk that something it does, the landlord will say, oh, you're doing something you're not permitted to do. So it wants that to be as broad as possible. But how do you get from that to the inference that anything that it wanted to be allowed to do in the space is its business? Well, it's defined its business by the permitted use, and that's — even if that's not persuasive, Your Honor, go back to my other point of all these other things it does besides walk-in retail sales. It does the pick, pack, and ship. It does the display. It does the signage. But can I just interrupt for a second? I mean, the language of the lease, you know, talks about the operation of business, and it doesn't seem that the district court considered or even attempted to interpret that term. Am I wrong about that? I think it just adopted the R&R. The district court was not — did not drill down on permitted use — excuse me, did not drill down on its business. I agree with you that that is not explicated in the district court's decision. But the R&R was quite thorough. The R&R, which was adopted, and adopted almost by reference, was thorough in talking about that. They objected, saying that the term, you know, operation of their business, has a meaning and that it's distinct from use, use occupancy or enjoyment. And that didn't seem to me that the district court engaged with that objection. Am I wrong? The district court did not drill down much on that objection, but the R&R was very thorough in talking about the different aspects of what the business is. The business is the pick, pack, and ship. The business is the display. You've got 7,000 units in that. So according to the analysis that was made by the magistrate judge and adopted by the district court, it didn't have to go anywhere near as far as they went. They said that your business is done, the showing that your business is done is that you were permitted to receive online orders and fulfill them by a single employee from this location. But it could have gone much shorter than that. It could have said nothing prevented you from having a sign outside the store or from having merchandise in the windows. And even if that was the only thing you were permitted to do, or alternatively, you could still use the store as a warehouse. You could store goods there. If that was the only thing you were permitted to do, that would be good enough because those were among the permitted uses. But exactly, all of those things are part of the business, part of the business of free people. And in that anthropology... I mean, it seems to be making operator business surplusage. I mean, there's two phrases separated by an and or, and you're saying they're the same. The and or, we recognize the and or that if they can prove that they cannot conduct their business, that there would have been a taking for those 17 days. But we show that their business is broad. It has things besides the retail sales. The fact that they couldn't do the walk-in traffic from the meatpacking district for the 91 days is not a defeat of their business because their business had the website, had the pick, pack, and ship, had the display, had the signage. Their business has what they call the only channel, where it is all different kinds of transacting business. If the agreement is interpreted that way, it seems to me that there's kind of a weird inconsistency in this takings provision because the provision is very explicit that if a portion of a store is taken, if any portion of the store is taken, it becomes not usable by reason of a government regulation or so forth. If like 1%, they are entitled to either terminate the lease on behalf, because of that, or to have an adjustment of the rent. None of it's temporary, Your Honor. I hate to disagree. I understand that. But if it's permanent, if it's permanent because 1%, because 1% is taken, they're entitled to either terminate or get a proportionate pro-rata reduction of the rent. On the other hand, if 99.99999% of what the purpose of the premises is for, to sell in retail, if 99.99999% becomes forbidden by the regulation, but the tiniest little fragment remains, then they have no opportunity whatsoever. Why should the contract, it seems to be bizarre that the contract would be interpreted to mean those two things that are so diametrically opposite to each other. If they have their hands tied, all they can do is store some merchandise there. That's not a taking. But if a square foot of the store gets taken by the government and prevented to be used, that permits them to either get out of the contract altogether or get a rent adjustment. It's strange. And at the lower court, there was no focus on that conundrum. And you may have spotted something, Your Honor, that wasn't spotted at the lower courts. All right. Well, we've gone over with you, Mr. Savino, but we'll hear now from Mr. Fetter. Thank you. Thank you.  Good morning. I please the Court, Gil Fetter, for the landlord, Delsha. I'm only here to talk about the cross-appeal. With respect to the offset of the percentage rent, there is, well, we all know in New York, commercial landlords have no duty to mitigate unless there's a duty to mitigate in the lease. In this lease, there's a duty to mitigate under 22E. Then what do we do next? There was a negotiation between a landlord and a tenant, and 22D was decided. In 22D, it is the tenant's burden of proof to prove for any offset from the rent what could have been reasonably avoided. So what happened below is magistrate came and later the district court judge said there is an uncertainty here as to how much percentage rent is going to be. And because that uncertainty wasn't caused by the tenant, it's up to the burden shifts to the landlord to prove it, to prove what the uncertainty is. The problem with that is there is no uncertainty here. We knew when the decision came down what the numbers were. We had the actual numbers. We knew that the threshold for meeting the percentage rent was not going to be met. How do we know that? Because we have their gross sales. So not only that, the judge is ignoring that the burden under 22D is on the tenant, not on the landlord. And the tenant submits an expert report that comes up with, I'm sorry to say, absolutely crazy numbers, $8.5 million in 22 and 23. When we knew that the gross sales were only $500,000, so the threshold wasn't going to be met. So that 10 percent figure wasn't going to be met. And what the court below said was, well, you, landlord, did meet your burden. You didn't put in computations of what the rent was, what the percentage rent was going to be. We did. We said the number is zero, and we have the proof, and we showed the numbers. And that was disregarded. And what was really, really upsetting here is in 23, before these decisions came down, that new tenant left. The new tenant left, and we were suing the new tenant for rent in Landlord-Tenant Court. How is it that that isn't taken into account? That's wrong. Not only did we give you the numbers, the historical figures, which showed it would be zero, but we had no tenant. And yet the court took $1.2 million off the figure. As of what point should the issue of what you could reasonably do with reasonable energy to get a new tenant be calculated? Well. Is it as of the point where the breach takes place or as of the point where something happens later? You know, sooner or later we have to stop this in time, right? You want to stop it in time.  Pretty reasonably now, I guess. Right. This tenant left, okay. But what if you could get a new tenant the day after and you didn't? You know, how do we decide other than by going back to the beginning and saying, as of the time that this breach took place, assuming it did by then, and they failed to comply with their obligation to pay rent? We're always looking and making projections into the future, it seems to me. Were it not for the law's delay, as Hamlet calls it, were it not for the fact that it takes a long time to get to the point of finding liability, now we know a lot of things about what the damages were up until that point, but we don't really know what would take place over the last remaining years of their lease, because you still could go out and get another tenant to replace, and maybe you have, the one that abandoned you that was the new tenant. Right. So where do we draw the line, and why isn't it the case that we should start somewhat earlier and assess, well, really isn't the job of experts to come in and say, here's what's the going rate for this kind of store in this kind of neighborhood, and here's how difficult it is to get new tenants, and here's why it's problematic, and so on? Right. And in this case, we did have affidavits and brokers telling you, boy, it's a really tough time after the pandemic to get a retail tenant. We're lucky we got one. But to answer your question, as long as a reasonable effort under 22E is being made by the landlord, no. Remember, it's the tenant's burden in this lease to prove what we would have gotten. But as long as they're making a reasonable effort and can't find anybody, the answer is there is no offset. Well, and they're not actually consistent with at least the theory that I was presenting. I'm not saying they're inconsistent internally. But they're not so much saying this all turns on just the guesswork of the experts as of day one of how hard it would be and what the going rate would be, and if you had to just rent it to the first comer, what would that cost? What would you get out of that? They're actually pointing to this contract that you had. Right. And I think you have arguments that would say it's not just that it's very good for you, perhaps, that it turned out that you didn't get any percentage rent, but a lot of this could have been predicted. If you look at what the trend line was of what Chelsea Winery's business was doing, even in what was arguably a better place for them than your storefront. You know, if you try to decide what's going on post-pandemic compared to, I mean, their calculations are based on pre-pandemic sales, and post-pandemic is a different story. You know, so there are a lot of things that we could look to. But I'm still trying to figure out, like, what is really the right way to do this? And you're saying, understandably for your side, that, well, the right thing to do is to say zero because that's how it turned out. Well, isn't the better proof under all the cases we cite the actual number and someone taking a guess? And when the guess here is so far off from what the gross really was, we knew what the gross was in 22. It was $550,000, and they're guessing $8.5 million. With those numbers in front of them, where's that coming from? It's way off. And so, and again, they put the burden on us. So I'm just saying, and this goes both ways. Remember, this is a very dangerous decision, if you will, in the mitigation of damages world, which is kind of why I'm here. I'm the one who lost the Kenneth Cole case in 95. So there is no duty to mitigate for commercial tenants in New York. But the point here is we've put in these provisions so the landlord is made whole and there's no double recovery. The opposite here could be true, too. Suppose we were making $100 million in percentage rent, and we said, well, we could have made less. They'd be the first to say, wait a minute, they're making $100 million in rent. When you have the actual numbers, that's critical, and that's what all your cases say, and I've gone over. So thank you for your time. All right. Thank you. Let me ask you something else. Has there been any effort to settle this case? There have been some settlement discussions, yes. I mean, when you look, you see a lot of different kinds of cases. Here's one where this completely unpredictable COVID-19 pandemic makes the space unusable. If there ever was a case that kind of cried out for splitting the baby in some fair way, this seems to be a high candidate for it. Okay. Thank you. One other thing. I'm right, am I not, that if they win on the liability, then the cross appeal is moot? I guess so. It depends what the – Because this is the – this whole cross appeal is premised on the idea that they are liable because they're the ones who breached the lease. Correct. And because they breached the lease, we're entitled to rent, and they're entitled to deduction from rent. Right. That's right. Thank you. Thank you. We'll now hear from Mr. DiPicci for a few minutes. Thanks, everyone. I'll just start in response to your question, Judge LaValle, about settlement. Without breaching the confidentiality of the CAMP program, we've been to the CAMP mediators twice in the course of this appeal, in addition to discussions below, and no resolution was reached. But, yes, I agree that this seems to be a case that at first blush should be right for that kind of an outcome. Should we draw the inference that a return to CAMP would be futile? We were there at the end of calendar 2025 with no change, so I think that inference is likely correct, Your Honor. But I don't presume to speak for Mr. Cedeno. I just – I should know. I don't. But, Your Honor, just on a couple of the points Mr. Federer noted in the cross-appeal, on the maybe, Judge Lindstrom, questions about where – how you draw the line, I think that here, in this case anyway, it's determined by that language in the lease that reasonably could have avoided language. And in the fourth-step brief, Delshaw conceded that they're not disputing that this should have been an ex ante projection. So some of the sort of comments about, you know, cross-checking or looking back are inconsistent with that. Acknowledging that that language from the lease really governs here. And as a practical matter, you can't really sort of open up that box after the fact and say, well, there was a delta between the projections and the actual. Well, weren't you opening up that box? Because your calculations of damages also rely on the lease that they actually got, not on just some expert's view of, you know, in theory, what might we predict that the market will do. You go to the lease that they actually got, which has a base rent that's relatively small and a sort of gigantic bonus provision based on how well the tenant does. So up to that point, you're saying, oh, that's the best measure of what we can project they might get. But then you want to say, but stop. Now we'll just look at that and do guesswork, in effect, educated guesswork, as to what they're going to get out of the percentage clause in this lease, not out of a theoretical lease that some expert tells you is the, you know, best guess at what the market would bear. We did have, well, backing up to the assumption and the question, we did have other, our expert report did suggest that other measures of their alternate, the avoidable rental loss were appropriate. Those were not accepted by the magistrate and the district court. And we accepted the sort of lease arrangement as it was ultimately entered into as the legal framework. But then, yes, our expert did do those projections. But I think that you can't really then go back and say, were those project, was there a methodological flaw in the analysis? Because that's really what this is, is challenging the expert's submission of evidence and saying, well, because there was a delta there, there must have been a flaw in what the expert did. But you can't work backwards that way. There could have been, they could just be really bad at running their winery. They could be really bad at running their business. We don't know. And on the burden shifting point, which is, I think, related, the district court didn't shift a burden. It said in footnote three of its order adopting the R&R, Delsha didn't propose an alternate framework. Their expert didn't talk about the avoidable rental loss at all. And I think his point, which is well taken, is that you make a strategic choice when you do that as a litigant. If you decide not to put your own damages model in, you're hoping you can poke enough holes in the other side's damages model that maybe there won't be a damages model. But you run the risk that if it gets accepted, it will be higher than it might otherwise be. I have two other questions, if I may, in terms of your side of the case. If you are correct about that they breached the lease by terminating it improperly, what is your measure of damages? And has that ever been calculated, or would that just require a new, a remand and a new determination by the district court? It's never been determined because of the way the R&R turned out. We have our submissions on that, so yes, it would have to go back. So it would have to go back. Yes. And other than on the unjust enrichment claims, but maybe even there, if that all gets folded into everything else. Yeah. Okay. And secondly, this lease also waives a jury trial, right? Yes. So it would be back to the same judge and magistrate to decide not on a summary judgment basis. All right. With respect to the damages determination, go back to the question that we started with at the very beginning. Nobody – everybody treats the damages, what was called an inquest, as effectively a bench trial on damages. Does that mean that the question – first of all, is that true? Is that what you guys are both thinking happened? Would that mean that the standard of review is clear error because there essentially were findings of fact by a magistrate recommending and a district judge adopting certain numbers and on certain theories? Would we have to decide then not whether they're just right or wrong or whether reasonable people could come out to a different conclusion if there were actually a whole trial on this? You're saying that was the trial, and the standard of review is error of law or clear error of factual determination. Is that right? I'm trying to think, Your Honor, candidly, what factual determinations were made on the inquest, where there were disputes of fact. I don't – I struggle to think of any. I think that there are some – Well, isn't it a question of fact what the market rate would properly be? If you just went to a jury, you'd have these experts testify, and the judge would instruct the jury something like, well, here's what is required and here's what the standard is. Go to it and figure out what the damages are. No, I suppose that's right, Your Honor. In that circumstance, you would have a – you know, it would be a fact-finding. And I think that in this circumstance, I don't know that there are disputes of fact as to the calculations, the mathematics really are. Not the mathematics, but just it would be a factual – it is a factual question, is it not? What the market rent would be. What the market would be. And we have all kinds of evidence based on what the experts say, based on the lease that was negotiated with the successor tenants and so on. Yes, and which is why we think – one of many reasons why we think it's very difficult to overturn the district court's reliance on the expert here. All right. And the other thing that no one has talked about is what are people entitled to – what were you entitled to in your view if there was a temporary taking? In other words, a couple of things happened here. A lot of different things happened. First, there's one government order. Then there's a different government order. Then eventually those orders are lifted, but by that time the parties have taken certain steps that may be irrevocable. But the period of maximum imposition on your business was a relatively short period. Is that a problem in any way for this case? Because nobody's really talking about that. No, Your Honor. There is no minimum duration for a temporary taking to occur. So it's 91 days is our calculation here.  So an abatement for that period of time for the affected space and excusal of the obligation to pay, I mean, or excuse from our obligations generally under the bill was during that time. If you are right, your contention is that if you are right that there was a taking, even a temporary taking, then they were at fault for terminating the lease because they shouldn't have done that. So you would be entitled to some sort of damages, but that's to be determined because that's never – That's never, right. We had submissions on that, correct, in our original papers, but yes. Right. Okay. All right. I guess that's – What was the definition of temporary? It says the taking is not deemed temporary as that term is hereinafter defined. What was the definition? I believe it's – 20D? Yeah, I believe – Is that correct? Thank you. I believe it is – A taking, whether partial or total, shall be deemed temporary if as of the date on which the taking commenced, the tenant has the expectation that within 365 days after the taking, your access and egress will be restored. Right. I would hesitate to even venture a guess as to what a fact finder would find about that. I do sort of remember that at the very beginning of COVID, there was a kind of atmosphere that, oh, this will be over in –  Yeah, right, not very long. Yeah. But then that turned out to be wrong. Yeah. You're not suggesting it's something other than a temporary taking? No. Temporary taking. Right. Okay. Yes. But I get one quick question, though. I mean, so if we were to agree with you that the judgment has to be vacated with respect to the contract claim from Delsha, that means the district court would get to take a crack at the other language in the lease, right, the operation of the business. Yes, Your Honor. If it turns out that you lose then on that, the district court explains its reasoning, would the damages award then be intact or would you think you get another crack at damages at that point? Do you mean to argue that the damages are less than what was found the first time or different? Yeah. I mean, I'll answer that two ways, Your Honor. I think as a matter of formal procedure, I think this Court vacates, it vacates, and then we would be in a position to argue that again. As a practical matter, though, I think we all have an interest, I think, to some of Judge LaValle's questions in bringing this to a conclusion as expediently as we can. So with the exception of the attorney's fees, which are a separate thing, I suspect that a lot of the same, hopefully we could come to some understanding of how to expedite this. You're just, well, the landlord is making a claim that the damages should have been a million dollars higher. Right? Yeah. Yes, of course, they have their cross-appeal. Because of the allocation of the burden. Yes. And if you don't decide that, as you wouldn't, I suppose, if you didn't reach the cross-appeal issues, then I suppose they would still have those arguments to raise in that proceeding, yes. All right. Well, thank you all. We will reserve decision. Thank you.